**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SAVANNAH STANTON, | ) | |
| | ) | CIVIL ACTION NO.: |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| PENN STATE HEALTH | ) | |
| COMMUNITY MEDICAL | ) | |
| GROUP LLC; | ) | |
| | ) | |
| ASHLEY GUNKLE; | ) | |
| | ) | |
| LAURA HORN; and | ) | |
| | ) | |
| RUTH GUNDERMANN, | ) | |
| | ) | *ELECTRONICALLY FILED* |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Savannah Stanton, by and through her attorneys, files this Complaint against Defendants and states as follows:

## INTRODUCTION

Seeking to be "Pennsylvania's most trusted health care organization," Defendant Penn State Health Community Medical Group's purported mission is to "continually improve the health and well-being of the people of Pennsylvania and

1

beyond."[1] But when it comes to accommodating its own employees with disabilities, Penn State Health could not be trusted. And they certainly didn't care about the health or well-being of its disabled employees.

Plaintiff Savannah Stanton suffers from an autoimmune disease called systemic lupus erythematosus, and she often underwent infusions to help her manage her condition. To attend one of these infusion treatments, Ms. Stanton asked her manager, Ashley Gunkle, if she could take her laptop because she expected to be able to work. Although Ms. Gunkle approved Ms. Stanton's request, Ms. Gunkle, along with Employee Relations Specialist Laura Horn, required Ms. Stanton to complete accommodation paperwork, which resulted in Ms. Stanton being allowed to further take (i) a 10-minute break every two hours worked; or (ii) a 20-minute break for every four hours worked. As indicated by Ms. Stanton's physician, the breaks would provide an "opportunity for a mental and physical break" to "catch her breath."

While on the surface, it appeared that Defendants were willing to accommodate this request, Penn State sought to impose onerous reporting requirements on Ms. Stanton by requiring her to: (i) inform Ms. Gunkle at the start and at the end of the designated break between 7 a.m. and 11 a.m.; (ii) take lunch

---

[1]    "About Us," *PennState Health* website, available at https://www.pennstatehealth.org/about-us (last accessed October 7, 2024).

between 11 a.m. and 12 p.m.; and (iii) inform Ms. Gunkle at the start and at the end of the designated break between 12 p.m. and 3:30 p.m.

Although Defendants initially approved Ms. Stanton's requested accommodation, they quickly weaponized it as a tool for unfounded criticism and micromanagement. From the moment Ms. Stanton's accommodation was approved, her manager, Ms. Ashley Gunkle, began subjecting her to excessive oversight and nitpicking, requiring her to report the start and end of each break to the minute, scrutinizing even the smallest deviations from this schedule—all of which worked against Ms. Stanton's physician's recommendation to provide a mental and physical break. Ms. Gunkle then manufactured a record of supposed infractions – through a baseless "Letter of Concern," "Disciplinary Letter," and a "Performance Improvement Plan" – to justify her eventual termination. The micromanagement Ms. Stanton endured was a stark departure from the flexibility afforded to her prior to her accommodation request, underscoring the retaliatory nature of Defendants' conduct and the creation of a hostile work environment on the basis of Ms. Stanton's disability.

This campaign of baseless disciplinary measures culminated in Ms. Stanton's termination only nine working days into her Performance Improvement Plan, which was itself based on pretextual claims of unprofessionalism and alleged deficiencies that were unsupported by any objective evidence. Indeed, Ms. Stanton had recently

been publicly recognized for her contributions by her leadership team—a fact disregarded by Defendants as they pursued a strategy to force her out.

Defendants' actions not only reveal a disregard for Ms. Stanton's rights under the ADA and other disability protection laws but also demonstrate a deliberate attempt to disguise discrimination as legitimate managerial oversight. By choosing to micromanage Ms. Stanton's necessary medical accommodations rather than support them, Defendants engaged in a pattern of unlawful conduct, culminating in Ms. Stanton's wrongful termination in violation of her federal and state rights.

Accordingly, Ms. Stanton files this Complaint in an effort to hold Penn State Health and its employees accountable for their illegal behavior.

## JURISDICTION AND VENUE

1.     Jurisdiction of the claims set forth in this Complaint is proper in this judicial district pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 *et seq.*, as amended by the ADA Amendments Act of 2008 (hereinafter "ADA"), Rehabilitation Act of 1973, as amended, 29 U.S.C. §701 *et seq.* (hereinafter "Rehab Act"), and 28 U.S.C. §§1331 and 1343.

2.     This Court has, and should exercise, supplement jurisdiction over Ms. Stanton's state claims under the Pennsylvania Human Relations Act, as amended, 43 P.S. §951 *et seq.* (hereinafter "PHRA") pursuant to 28 U.S.C. §1367.

3.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in this judicial district.

## THE PARTIES

4.     Plaintiff Savannah Stanton is an adult individual residing at 7105 Huntingdon Street, Harrisburg, Dauphin County, Pennsylvania 17111.

5.     At all times relevant and material hereto, Ms. Stanton was diagnosed with systemic lupus erythematosus, an autoimmune disease, which qualifies as a disability under the ADA, Rehab Act, and PHRA.

6.     Defendant Penn State Health is a Pennsylvania limited liability company with headquarters in this district at 100 Crystal A Drive, Hershey, Dauphin County, Pennsylvania 17033.  Upon information and belief, Penn State Health is a multi-hospital health system serving patients in central Pennsylvania.

7.     At all times relevant to this Complaint, Penn State Health was a covered "employer" as defined under and pursuant to the ADA and PHRA.

8.     Upon information and belief, at all times relevant to this Complaint, Penn State Health received federal funds in the form of Medicaid and Medicare payments and is thus a federally assisted program within the meaning of Section 504 of the Rehab Act, 29 U.S.C. §794.

9.      At all times relevant to this Complaint, Penn State Health acted through its agents, servants, apparent agents, and/or managerial employees who, collectively, were authorized to act and did act within the scope of authority, course of employment, and/or under the direct control of Penn State Health.

10.     Defendant Ashley Gunkle is an adult individual, who acted as an agent, servant, apparent agent, and/or managerial employee of Penn State Health at all times relevant to this Complaint.

11.     At all times relevant to this Complaint, Ms. Gunkle was a decision-maker with regard to Ms. Stanton's employment with Penn State Health.

12.     Defendant Laura Horn is an adult individual, who acted as an agent, servant, apparent agent, and/or managerial employee of Penn State Health at all times relevant to this Complaint.

13.     At all times relevant to this Complaint, Ms. Horn was a decision-maker with regard to Ms. Stanton's employment with Penn State Health.

14.     Defendant Ruth Gundermann is an adult individual, who acted as an agent, servant, apparent agent, and/or managerial employee of Penn State Health at all times relevant to this Complaint.

15.     At all times relevant to this Complaint, Ms. Gundermann was a decision-maker with regard to Ms. Stanton's employment with Penn State Health.

6

## ADMINISTRATIVE PROCEEDINGS

16.    On or about January 2, 2024, Ms. Stanton filed a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC"), which was docketed as Charge No. 530-2024-02259, with an instruction to be cross-filed by the EEOC with the Pennsylvania Human Relations Commission (hereinafter "PHRC").

17.    Ms. Stanton has been advised by the EEOC of her right to sue in federal court, which notice was issued on August 6, 2024, and received thereafter.  A true and correct copy of this letter is attached hereto as **Exhibit A**.

18.    All necessary and appropriate administrative prerequisites to this action have been met.[2]

## STATEMENT OF FACTS

19.    Savannah Stanton suffers from systemic lupus erythematosus, an autoimmune disease.

20.    Lupus occurs when the immune system (which normally helps protect the body from infection) attacks its own tissues, causing widespread inflammation and tissue damage in the affected organs.

---

[2]    Ms. Stanton's claims for disability discrimination were "dual-filed" with the PHRC on or about January 2, 2024.  As such, the interest of judicial economy is best served litigating the federal and state law claims together.

21.     Lupus presents as many symptoms, including chest pain, fatigue, blood abnormalities (such as anemia), and arthritis, among many others.

22.     To help treat lupus, Ms. Stanton takes prescription and non-prescription medications and injections.  Ms. Stanton also often undergoes infusion treatment, which she started soon after her initial diagnosis in 2009.

23.     Ms. Stanton started working at Penn State Health as a Senior Administrative Assistant on or around May 5, 2022.

24.     Ms. Stanton's primary responsibilities included providing administrative support for leadership, which included coordinating communications, developing presentation materials, interpreting and communicating policies and procedures, and coordinating meetings, events, and arrangements. A true and correct copy of the job description is attached as **Exhibit B**.

25.     The leadership Ms. Stanton supported consisted of Dr. Lloyd M. Wolf (Internal Medicine), Marc Van Eik (Senior Director of Ambulatory Practices), and Mary Moyer (Director of St. Joseph Regional Health Network's Reading campus).

26.     Ms. Stanton primarily worked from home except in the rare occurrence when she needed to attend in person, such as for a quarterly meeting. Before the discrimination and retaliation Ms. Stanton faced at Penn State Health, Ms. Stanton never had to inform anyone about any breaks she took or when she would be away from her desk for lunch.

27.    On or around May 26, 2023, Ms. Stanton had an infusion treatment scheduled during the workday. Ms. Stanton expected to be able to work while she received the infusion, so she asked her manager, Ms. Gunkle (Penn State Health Senior Coordinator Administrative Support), if Ms. Stanton could take her laptop to the clinic.

28.    Ms. Gunkle allowed Ms. Stanton to take her laptop. Ms. Gunkle stated that she did not see Ms. Stanton taking her laptop as a problem, because when Ms. Gunkle was pregnant, Ms. Gunkle would often take her laptop when she went for her appointments.

29.    But, much to Ms. Stanton's surprise, Ms. Gunkle copied Ms. Horn (Penn State Health Human Resources Specialist) requiring Ms. Stanton to complete a form requesting an accommodation under the ADA.

30.    Ms. Stanton provided the ADA form to her provider, who completed it and returned it to Ms. Horn and Ms. Gunkle. Ms. Stanton's physician indicated that Ms. Stanton should be provided with the breaks, which would provide an "opportunity for a mental and physical break" to "catch her breath."

31.    On June 26, 2023, Penn State Health approved the ADA form.

32.    On June 28, 2023, Ms. Horn wrote a letter stating that Penn State Health agreed to provide either (i) a 10-minute break every two hours worked; or (ii) a 20-minute break for every four hours worked. Ms. Horn instructed Ms. Stanton to work

with Ms. Gunkle to determine break schedules and explained that the accommodations "may be reconsidered at any time". A true and correct copy of this document is attached as **Exhibit C**.

33.    In particular, Penn State Health informed Ms. Stanton of the following requirements: (i) inform Ms. Gunkle at the start and at the end of the designated break between 7 a.m. and 11 a.m.; (ii) take lunch between 11 a.m. and 12 p.m.; and (iii) inform Ms. Gunkle at the start and at the end of the designated break between 12 p.m. and 3:30 p.m. Later that day, Ms. Gunkle again told Ms. Stanton that she needed to inform Ms. Gunkle each time Ms. Stanton was taking a break.

34.    Almost immediately after Ms. Stanton's accommodation was approved, Penn State Health and Ms. Gunkle began surveilling Ms. Stanton's every move and micromanaging breaks to the very minute. This had never happened before.

35.    For example, on July 5, 2023, Ms. Gunkle again asked Ms. Stanton to join a Microsoft Teams call with her manager, Ms. Gundermann (Penn State Health Senior Director, Operations and Performance). At that time, Ms. Gunkle complained that (i) Ms. Stanton had taken a break at 11 a.m. (which was outside of the time outlined for Ms. Stanton's breaks); (ii) Ms. Stanton had not taken an afternoon break on June 30, 2023; and that (iii) on July 3, 2023 Ms. Stanton did not report her return from her morning break and did not report an afternoon break. Ms. Gunkle further complained that, on June 30, 2023, Ms. Stanton answered a question from Ms.

Gunkle after Ms. Stanton properly and timely clocked out. Ms. Gunkle also lobbed accusations against Ms. Stanton, calling her unprofessional among other names.

36.     On July 5, 2023, Ms. Stanton asked Ms. Gunkle if Ms. Stanton would be receiving a written disciplinary action, to which she responded, "No." However, Ms. Gunkle prepared a so-called "Letter of Concern." A true and correct copy of this document is attached as **Exhibit D**.

37.     On July 6, 2023, Ms. Gunkle and Ms. Gundermann again asked Ms. Stanton to join a Microsoft Teams call. During that call, Ms. Gunkle informed Ms. Stanton that she would receive a written disciplinary warning (called a Disciplinary Letter) for failing to follow Penn State Health's attendance and timekeeping policies, among other supposed infractions. A true and correct copy of this document is attached as **Exhibit E**.

38.     In particular, Ms. Gunkle complained that on July 5, 2023, Ms. Stanton had taken a 25-minute break instead of 20 minutes and that on July 6, 2023, Ms. Stanton had taken a 15-minute break instead of 20 minutes.

39.     Ms. Gunkle also claimed that Ms. Stanton was not completing her work, that Ms. Stanton had sent unprofessional, rude, and disrespectful emails to Ms. Gunkle, Human Resources, and other unnamed Penn State Health employees. Ms. Stanton immediately asked to see the allegedly unprofessional, rude, and disrespectful emails, to determine if something had been misconstrued. Ms. Gunkle

assured Ms. Stanton that she was "sure [she] could find some," but Ms. Gunkle never provided any such emails to Ms. Stanton.

40.    Despite Ms. Gunkle's claims that Ms. Stanton was unprofessional, rude, and disrespectful, Ms. Stanton's leadership team felt differently. During an in-person quarterly meeting, Ms. Stanton was recognized in front of the entire meeting for her performance and contributions and thanked by leadership.

41.    This recognition, however, did not deter Ms. Gunkle and Penn State Health's campaign to terminate Ms. Stanton. On July 14, 2023, Ms. Gunkle, apparently with Ms. Horn's approval, placed Ms. Stanton on a performance improvement plan, which outlined supposed deficiencies and again reiterated the following requirements: (i) inform Ms. Gunkle at the start and at the end of the designated break between 7 a.m. and 11 a.m.; (ii) take lunch between 11 a.m. and 12 p.m.; and (iii) inform Ms. Gunkle at the start and at the end of the designated break between 12 p.m. and 3:30 p.m. A true and correct copy of this document is attached as **Exhibit F**.

42.    Ms. Gunkle also claimed that Ms. Stanton was not completing her work and that she was not paying attention to detail. She also claimed that Ms. Stanton's behavior was "horrible"— again, without providing any details.

43.     The performance improvement plan, dated July 14, 2023, also provided a 60-day timeframe within which to improve Ms. Stanton's allegedly deficient performance.

44.     Before Ms. Stanton's disability disclosure and accommodation, she had never been written up, disciplined, or put on a performance improvement plan by Penn State Health while employed as a Senior Administrative Assistant.

45.     From July 20, 2023, to July 28, 2023, Ms. Stanton was on a pre-approved vacation.

46.     On Ms. Stanton's first day back, July 31, 2023, Ms. Stanton met with Ms. Gunkle and Ms. Gundermann for what Ms. Stanton was told would be a weekly performance meeting. Instead, Ms. Gunkle informed Ms. Stanton that she and Penn State Health would be terminating Ms. Stanton's employment.

47.     Ms. Gunkle claimed that, while Ms. Stanton was out, she "had to clean up my mess". She claimed that Ms. Stanton made Penn State Health and her team look bad and unprofessional.

48.     For example, Ms. Gunkle claimed that Ms. Stanton failed to properly order refreshments for a leadership meeting. But that was not true. Ms. Stanton was asked to order refreshments for a meeting that day, but Penn State Health's own requirements required 48-hour advance notice. Nevertheless, Ms. Stanton arranged for refreshments for the meeting, which occurred without any issue. Even still, Ms.

Gunkle again told Ms. Stanton that her behavior was completely unprofessional and that Ms. Stanton's behavior "was poor."

49.    After Ms. Gunkle terminated Ms. Stanton, Ms. Gunkle then asked Ms. Gundermann if she had anything to say. Ms. Gundermann stated, "Ashley has tried to help you and work with you since the ADA form has been in place. How about you just resign to help you out better?"

50.    Stunned at Ms. Gundermann's blatant attempt to shield Penn State Health's illegal behavior, Ms. Stanton declined her offer.

51.    Penn State Health terminated Ms. Stanton's employment, effective July 31, 2023. A true and correct copy of the termination letter is attached as **Exhibit G**.

52.    The termination of Ms. Stanton's employment on July 31, 2023 occurred about one month after the accommodation was approved on June 28, 2023 and just 9 working days into the 60-day period in the performance improvement plan.

53.    Defendants possessed no good faith, legitimate business justification to terminate Ms. Stanton's employment.

54.    The purported basis for Defendants to terminate Ms. Stanton's employment is invalid, untrue, and a pretext for unlawful discrimination.

55.    The termination of Ms. Stanton's employment constitutes adverse employment action.

56.    Defendants violated Ms. Stanton's federal rights, pursuant to the ADA and Rehab Act, and state rights, pursuant to the PHRA, by terminating her because of her disability.

## COUNT I

**ADA VIOLATIONS**
**Disability Discrimination**
***Stanton v. Penn State Health***

57.    All prior paragraphs are incorporated herein as if set forth fully below.

58.    Plaintiff is within the protective class of individuals, as designated by the ADA, protected against discrimination in the workplace on account of a disability, a record of disability, and/or the perception that Plaintiff is an individual with a disability.

59.    Plaintiff was subjected to discrimination and disparate treatment on the basis of her disability, her record of disability, or Defendants' regard of her as an individual with a disability in a manner affecting the terms and conditions of her employment.

60.    As previously set forth above, soon after Defendants learned of Plaintiff's disability, she was immediately discriminated against and ultimately terminated effective July 31, 2023.

61.    As a direct and proximate result of Defendants' conduct in violating the ADA by discriminating against Plaintiff on the basis of her disability, record of a

disability, and/or perceived disability, Plaintiff has been permanently and irreparably harmed and damaged, and has and will continue to lose benefits of employment such as lost earnings, lost employment benefits, and non-economic damages in the form of emotional distress, embarrassment, humiliation, anxiety, and a loss of self-respect and confidence.

62.     Defendants' discrimination towards Plaintiff arising from her disability constitutes violations of her federal rights under the ADA.

**WHEREFORE**, Plaintiff Savannah Stanton, seeks the damages set forth in the *Ad Damnum* clause of the instant Complaint, *infra.*

## COUNT II

**ADA VIOLATIONS**
**Disability Discrimination - Hostile Work Environment**
***Stanton v. Penn State Health***

63.     All prior paragraphs are incorporated herein as if set forth fully below.

64.     Plaintiff is within the protective class of individuals, as designated by the ADA, protected against discrimination in the workplace on account of a disability, a record of disability, and/or the perception that Plaintiff is an individual with a disability.

65.     Plaintiff was subjected to a hostile work environment on the basis of her disability, her record of disability, or Defendants' regard of her as an individual with a disability in a manner affecting the terms and conditions of her employment.

66.    As previously set forth above, soon after Defendants learned of Plaintiff's disability, she was immediately subjected to unwarranted discipline and job scrutiny.

67.    Upon information and belief, non-disabled employees similarly situated to Plaintiff were not subjected to unwarranted discipline and job scrutiny from employment with Penn State Health.

68.    As a direct and proximate result of Defendants' conduct in violating the ADA by discriminating against Plaintiff on the basis of her disability, record of a disability, and/or perceived disability, Plaintiff has been permanently and irreparably harmed and damaged, and has and will continue to lose benefits of employment such as lost earnings, lost employment benefits, and non-economic damages in the form of emotional distress, embarrassment, humiliation, anxiety, and a loss of self-respect and confidence.

69.    Defendants' discrimination towards Plaintiff arising from her disability constitutes violations of her federal rights under the ADA.

**WHEREFORE**, Plaintiff Savannah Stanton, seeks the damages set forth in the *Ad Damnum* clause of the instant Complaint, *infra.*

## **COUNT III**

### **REHABILITATION ACT**
### **Disability Discrimination**
### *Stanton v. Penn State Health*

70.    All prior paragraphs are incorporated herein as if set forth fully below.

71.    Plaintiff is within the protective class of individuals, as designated by the Rehab Act, protected against discrimination in the workplace on account of a disability, a record of disability, and/or the perception that Plaintiff is an individual with a disability.

72.    Plaintiff was subjected to a hostile work environment, discrimination and disparate treatment on the basis of her disability, her record of disability, or Defendants' regard of her as an individual with a disability in a manner affecting the terms and conditions of her employment.

73.    As previously set forth above, soon after Defendants learned of Plaintiff's disability, she was immediately discriminated against and ultimately terminated effective July 31, 2023.

74.    As a direct and proximate result of Defendants' conduct in violating the Rehab Act by discriminating against Plaintiff on the basis of her disability, record of a disability, and/or perceived disability, Plaintiff has been permanently and irreparably harmed and damaged, and has and will continue to lose benefits of employment such as lost earnings, lost employment benefits, and non-economic

18

damages in the form of embarrassment, humiliation, anxiety, and a loss of self-respect and confidence.

75.    Defendants' discrimination towards Plaintiff arising from her disability constitutes violations of her federal rights under the Rehab Act.

**WHEREFORE**, Plaintiff Savannah Stanton, seeks the damages set forth in the *Ad Damnum* clause of the instant Complaint, *infra.*

## COUNT IV

### PENNSYLVANIA HUMAN RELATIONS ACT
### Disability Discrimination
### *Stanton v. All Defendants*

76.    All prior paragraphs are incorporated herein as if set forth fully below.

77.    This is an action arising under the provision of the PHRA and this Court has, and should exercise, pendant jurisdiction over the same because the causes of action complained of in this Count IV arise out of the same facts, events and circumstances as Counts I, II and III, and therefore judicial economy and fairness to the parties dictates that this Count be brought in the same Complaint.

78.    As more fully set forth in Counts I, II and III, Defendants discriminated against Plaintiff based on her disability.

79.    Defendants violated Plaintiff's state rights under the PHRA by discriminating against Plaintiff on the basis of her disability.

80.    Ms. Gunkle, Ms. Horn and Ms. Gundermann aided and abetted in the discriminatory acts, as the decision makers for this conduct, toward Plaintiff.

**WHEREFORE**, Plaintiff Savannah Stanton, seeks the damages set forth in the *Ad Damnum* clause of the instant Complaint, *infra.*

## *AD DAMNUM* CLAUSE/PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Savannah Stanton, prays that this Honorable Court enter judgment in her favor and against the Defendants, and that it enters an Order as follows:

a.    Defendants are to be permanently enjoined from discriminating or retaliating against Plaintiff on the basis of her disability and/or any basis prohibited under applicable federal law;

b.    Defendants are to be prohibited from continuing to maintain their illegal policy, practice, or custom of discriminating and/or retaliating against employees based on their disabilities, and is to be ordered to promulgate an effective policy against such interference and/or discrimination and to adhere thereto;

c.    Defendants are to compensate Plaintiff, reimburse Plaintiff, and to make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses,

medical and other benefits, training, promotions, pension and seniority. Plaintiff should be accorded those benefits illegally withheld from the date she first suffered discrimination at the hands of Defendants until the date of verdict;

d.    Plaintiff is to be awarded interest on her monetary losses at the prevailing rate;

e.    Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused to her by Defendants' actions;

f.    Plaintiff is to be awarded punitive damages as permissible by statute;

g.    Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

h.    Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney fees as provided by applicable federal law;

i.    Plaintiff is to be granted such additional injunctive or other relief as she may request during the pendency of this action in an effort to ensure Defendants do not engage – or ceases engaging – in illegal retaliation against Plaintiff or other witnesses to this action; and

j.    The Court is to maintain jurisdiction of this action after verdict to ensure compliance with its Orders therein.

## <u>DEMAND FOR JURY</u>

Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiff respectfully demands a trial by jury.

Respectfully submitted,

**SHAH LITIGATION, PLLC**

Dated: <u>November 1, 2024</u>

*/s/  Vishal H. Shah*
Vishal H. Shah (PA 320231)
vishal@shahlitigation.com
867 Boylston Street
5th Floor, No. 1893
Boston, MA  02116
(617) 334-5825

**V PATEL LEGAL, PLLC**

*/s/  Vipul T. Patel*
Vipul T. Patel (PA 328462)
vipul@thegplawfirm.com
2550 Interstate Drive
Suite 300-B
Harrisburg, PA 17110
(717) 983-2555

*Counsel for Plaintiff*